12. That the testimony admitted and the testimony held inadmissible are not reported separately.

13. That the report does not state the facts and the conclusions of law separately."

The Circuit Court confirmed the report of the referee, and the defendant, Baird, appeals.

*Mr. Geo. W. Brown,* for appellant.

*Messrs. E. O. Woods* and *Geo. K. Dargan,* for respondents: *The statutory proceedings were not available to Kirven:* Civil Code, sec. 4166; 58 S. C. 98; 88 S. C. 428. *Consideration for waiver of landlord's lien.* See *Johnson* v. *Laurence,* 88 S. C. —. *Lien was waived to procure fertilizers to enable tenant to make crop from which rent could be paid:* 29 S. C. 9; 3 Strob. 207; 88 S. C. 415.

April 20, 1915.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

---

9077

MOORE *ET AL.* v. MARION COTTON OIL CO.

(85 S. E. 52.)

APPEAL AND ERROR. PRACTICE. ISSUES. NONSUIT. CONTRACTS. PERFORMANCE. CONDITIONS PRECEDENT. CHARGE.

1. APPEAL AND ERROR—REVIEW—HARMLESS ERROR.—There being no contention that the price offered for a commodity was up to the market price, and the exact market price not being in issue, error, if any, in admission of evidence as to such price is immaterial and harmless.

2. ISSUES—NONSUIT.—Where there is evidence on questions presented in an action, they are properly submitted to the jury, and nonsuit refused.

2*a*. MASTER AND SERVANT—RESCISSION OF CONTRACT—QUESTION FOR JURY.—In such action, evidence *held* to make the rescission of the contract a question for the jury.

2*b*. MASTER AND SERVANT—SERVICES—NONPERFORMANCE OF CONTRACT—EVIDENCE.—In such action, evidence *held* to make the sufficiency of plaintiff's pleaded excuse for nonperformance a question for the jury.

3. PRACTICE—VARIANCE BETWEEN PLEADING AND PROOF.—A variance between the allegations of complaint and proof may be cured by amendment under Code Civil Proc., sec. 220, and is not ground for nonsuit, unless the defendant has been misled thereby.

4. CONTRACTS—PERFORMANCE—CONDITIONS PRECEDENT—CHARGE.—Where there is no showing that conditions precedent to rendition of service have arisen, confusion, if any, in charge between performance and readiness to perform, is not prejudicial.

4*a*. APPEAL AND ERROR—HARMLESS ERROR—INSTRUCTIONS.—In an action for services under a contract to buy cottonseed oil at instructed prices, error, if any, in an instruction that if plaintiff was ready to perform, and went ahead and did his best to buy cottonseed oil, defendant was liable, whether he bought any or not, was harmless, where there was no showing that conditions for the services had arisen.

5. CHARGE ON FACTS.—A statement of facts by counsel in requesting a charge by the Court, does not render the charge made in response to such request on the facts.

6. CHARGE—CONTRACTS—RESCISSION.—A charge that the burden to show rescission of contract is upon the defendant pleading it, and if he fails, the verdict must be for the plaintiff, approved, where the Court had elsewhere charged that the plaintiff must prove the contract by the preponderance of the evidence.

7. CHARGE—CONTRACTS—PERFORMANCE.—A charge that a plaintiff in order to recover need show only a substantial performance of the contract on which they rely approved.

8. CHARGE—REQUESTS.—Where requests to charge have been covered in the general charge, they need not be repeated.

9. CHARGE—BURDEN OF PROOF.—A Judge is not bound to use the figure of balances when he charges on burden of proof.

10. CONTRACTS—RESCISSION.—Where after a rescission, the parties agree to continue operations under the original contract, that governs the rights of the parties.

Before HON. C. J. RAMAGE, special Judge, Marion, Spring term, 1914.   Affirmed.

Action by J. W. Moore and R. S. Moore, copartners under the firm name of J. W. & R. S. Moore, against Marion

Cotton Oil Company. From judgment for plaintiffs, the defendants appeal.

The appellant thus stated his case:

"This is an action by J. W. Moore and R. S. Moore, partners trading as J. W. & R. S. Moore, against the defendant, Marion Cotton Oil Company, for four hundred dollars for services alleged to have been rendered by plaintiffs to defendant under a written contract, which is set out in full in the case. The case first came on for trial at the Fall, 1913, term of the Court of Marion county before Judge H. F. Rice and a jury. One of the terms of the contract is that plaintiffs should ship their own individual cotton seed to defendant at the market price. It developed in the course of the testimony of the plaintiffs that this term of the contract had not been complied with, and the plaintiffs then sought to show an excuse for nonperformance, to which testimony defendant objected on the ground that the complaint had alleged a full performance of the contract, and that no excuse for nonperformance could be proved without an allegation to that affect in the complaint. Judge Rice sustained this objection, whereupon, on motion of plaintiffs, he withdrew the case from the jury and made an order permitting plaintiffs to serve an amended complaint setting up their alleged excuse for noncompliance with this term of the contract. Thereafter plaintiffs served an amended complaint alleging full performance of the contract mentioned in the complaint, except that term of the contract relating to the shipment of their individual seed, and as to that they alleged that they undertook to perform it, but were prevented by defendant's refusal to pay them the market price. At the Spring, 1914, term of Court for Marion county the case again, on the amended pleadings, came on for trial before special Judge C. J. Ramage and a jury. This trial resulted in a verdict for the plaintiffs for four hundred dollars, the full amount sought, and this appeal is from the judgment entered on that verdict."

The case contains the following statement:

Mr. M. C. Woods (plaintiff's attorney, addressing the Court) : "May it please your Honor, I wish it to appear in the record that Mr. Culven came to my office about these differences between the Oil Mill and the Moores, and we reached a full and complete settlement of the same and agreed at that time that it was a full and complete settlement, and Mr. Culven agreed that the salary question was left open. Mr. Culven will bear me out in that."

Mr. A. F. Woods (defendant's attorney) : "We agree that that statement is correct."

Mr. Culven was the manager of the defendant. After that settlement, the plaintiffs served their complaint alleging a breach of the contract on the part of the defendant on the one question left open, to wit, the salary, and alleged that they (the plaintiffs) had performed the contract on their part. Under the direction of the Court, the plaintiff alleged the nonperformance of another provision of the contract and his excuse for nonperformance.

The defendant by its answer denied the contract set up in the complaint, and the allegations as to the excuse for nonperformance, and set up that the contract had been rescinded. Near the end of the trial the plaintiffs and the defendant agreed to submit the question to the jury as an entire con-

---

FOOTNOTE.—The contract, evidence, and the instruction on readiness to perform were as follows:

*Contract (Exhibit A).*

This agreement made and executed, in duplicate, this 10th day of August, 1910, by and between Marion Cotton Oil Company, Marion, S. C., party of the first part, and J. W. & R. S. Moore, of Fork, S. C., party of the second part, Witness:

First. That party of the second part is to buy seed for the account of the party of the first part at Fork and Squire's Siding, and for no one else, during the season of 1910-11, or for a period of six months; that is, from September 1st, 1910, to March 1st, 1911, and is to pay such a price for them as he is instructed by party of the first part.

Second. That party of the second part is to use his time and influence towards promoting the interest of the party of the first part, both in

tract, and on that issue the jury found the plaintiff the entire amount claimed.

There were four questions in issue:

1. Did the defendant make the contract of service?

2. Did the plaintiffs perform their part of the contract?

3. Was the contract rescinded?

4. Was there sufficient excuse for nonperformance of the fifth clause?

There are seventeen exceptions, one was abandoned. The exceptions were consolidated in the argument and will be consolidated here."

---

the purchase of seed and the sale of products for their account, and in every other way possible.

Third. That any and all money advanced party of the second part by party of the first part is to be considered as trust money, to be used only in the purchase of seed, and is to remain the property of the party of the first part until so used.

Fourth. That party of the second part is to keep a correct record of all money paid for seed and is to make a daily report, showing seed bought and amount paid for them, also a report of receipts from products sold.

Fifth That it is further agreed that party of the second part is to ship to party of the first part such of his own seed as he may sell at the market price.

For and in consideration of above services, the Marion Cotton Oil Company, party of the first part, agrees to pay J. W. & R. S. Moore, of Fork, S. C., party of the second part, a salary of $100.00 per month, same to be paid at the last of each month.

Party of the first part also agrees to bear all expenses of draying and hauling seed from the place of party of the second part to cars in which they are loaded. They also agree to bear any other expenses incident to the business.

In witness whereof, the said parties above named have duly signed and sealed these presents, in duplicate, on the day and year first above written.                               Marion Cotton Oil Company,
                                              By Eugene C. Culvern, Mgr.
                                    J. W. & R. S. Moore,
Witness: L. H. Little.                          Per R. S. Moore.

R. S. Moore testified:

Direct examination, by Mr. M. C. Woods:

Q. Mr. Moore, are you one of the plaintiffs in this case? A. Yes, sir.

Q. On or about the 10th of August, 1910, did your firm enter into a

*Mr. A. F. Woods,* for appellant, submits: *As to evidence as to market value:* 13 Ency. Ev. 512; 16 Cyc. 1142; 140 Am. St. Rep. 230; 115 *Ib.* 546-554. *Variance between pleadings and proof:* Code Civil Proc. 212; 9 Cyc. 719 and 721; 2 Speer. 125; *Ib.* 121; 11 Rich. 42; 16 S. C. 192; 26 S. C. 327; 48 S. C. 298; 84 S. C. 73; 87 S. C. 84; *Ib.* 250;

contract with Marion Cotton Oil Company? A. Yes, sir. Q. Is this the contract (showing paper to witness)? A. Yes, sir.

Plaintiff introduced the following contract (appended hereto as Exhibit A):

Q. Mr. Moore, in pursuance of this contract, did you buy seed for Marion Cotton Oil Company at Fork and Squire's Siding during the season of 1910 and 1911? A. Yes, sir. Q. At such prices as you were given? A. Yes, sir. Q. Did you use your time and influence in promoting the interest of the oil mill to as great an extent as you could? A. Yes, sir. Q. Did you account for all money that you received for the purchase of seed A. I didn't call for any money until I had made a shipment. I furnished my own money to buy the seed, and, when I would have two or three or four hundred dollars in them, I would write them to send me a check, and they sent me a check. Q. You would apply it on the seed? A. Yes, sir. Q. Did you keep records of your purchases and make reports to them regularly? A. Yes. Q. Did you ship to the Marion Cotton Oil Company your own seed? A. No, sir. Q. Why not? A. Because they wouldn't pay me the market price.

Defendant's counsel objects to the witness stating that the oil mill did not pay the market price. The market price is one of the elements that is to be proved, and the jury is to decide what was the market price.

The Court: I think he can state that they wouldn't pay him the market price.

Mr. A. F. Woods: That is one of the elements that is to be proved; that is one of the points in contest, as to what was the market price. He can state what prices he was paying and what prices other people were paying, but the inference to be drawn as to what was the market price is an inference to be drawn by the jury and not the witness.

The Court: I think the question is competent.

(Exception noted by defendant.)

Q. Did you have many seed? A. Yes; I had a good many seed. Q. When did you get ready to sell your seed? A. Some time in the latter part of January. Q. When you got ready to sell them, what did you do? A. I tried at different places to see what I could get for them, and when I got the best prices I could get, then I called up the Marion Oil Mill and asked them (interrupted)— Q. Where all did you inquire as to the market price? A. I tried Lumberton, Maxton, Dillon, Dunbar, Mullins, and Marion. Q. Did you ascertain what seed were bringing at

98 S. C. 222; 59 Am. St. Rep. 272; 2 Sutherl. Damages 456, 69 S. C. 300. *Performance:* 21 S. C. 318; 69 S. C. 300; 70 S. C. 81; 99 S. C. 87; 20 So. 134; 98 S. C. 222. *Variance between pleading and proof material:* 9 Cyc. 717; 1 N. & McC. 341; 1 McM. 483; 2 Strob. 194. *Substantial performance:* 9 Cyc. 601; 2 Suthl. Damages 456. *Preven-*

that time? A. Yes. Q. What was the result of your inquiry as to what they were bringing at that time? A. Anywhere from 50 to 53 cents.

Mr. A. F. Woods: Does your Honor understand that I object to that testimony on the ground that it is purely hearsay?

The Court: You can test him on cross-examination. You object to all this testimony?

Mr. A. F. Woods: Yes, sir.

The Court: In my judgment it is competent.

(Objection overruled; exception noted.)

Q. Mr. Moore, when you ascertained the price seed was bringing, what did you do, if anything? A. I offered them to the Marion Cotton Oil Mill at the best price I was offered for them, both over the phone and by letter. Q. With whom did you have this conversation over phone? A. Mr. Culvern. Q. What position did Mr. Culvern hold; what connection did he have with Marion Cotton Oil Company? A. He was manager. Q. State what occurred in that conversation between you and Mr. Culvern? A. He stated that he was loaded on cotton seed—on high-priced cotton seed, I believe he put it—and he didn't want any more at those prices, and, if I could get that price for them, to go ahead and sell; that it would be perfectly all right with him. Q. Did he offer you any price for your seed? A. Yes; he offered me 45 cents. Q. What did you tell him in reference to that? A. I told him what seed was bringing at other places and what I thought I could get for them. Q. He said he didn't want them at that price? A. He said he didn't want them at that price; that he had a lot of high-priced seed, heating up on h'm, and he didn't want any more right then. Q. Did you express a willingness to sell to him at the market price? A. Yes; he said he didn't want them; he had plenty of them, more than he could attend to at that time, and, if I could get that price for them, to go ahead and sell them; that it was all right with him. Q. How much salary were they to pay you for the season of 1910-11? A. $600. Q. How much did they pay you? A. $200. Q. How much balance do they owe you? A. $400. Q. Have you or not demanded that balance? A. Yes, sir. Q. Did they pay you, or did they refuse to pay you? A. They refused to pay me.

Cross-examination:

Q. Mr. Moore, Mr. Culvern said he was loaded up with seed and didn't want any more seed because they were heating on him? A. Yes, sir.

*tion of performance:* 9 Cyc. 701; *Ib.* 721; 94 Fed. 975; 54 S. W. 728; 2 Hill 486; 2 Speer. 121; 99 S. C. 87; 91 S. C. 322. *Rescission:* 1 McC. 350; 33 S. C. 507.

*Mr. M. C. Woods,* for respondent, submits: *Party bringing out testimony cannot claim that its admission was preju-*

Q. Have you ever heard of seed heating the latter part of January? A. Yes, sir. Q. Where did you ever hear that; what mill? A. I have heard of it in several mills. I have heard them say so. I was not in the mill business, but I have had some of my own seed to heat about that time. Q. Don't you know the seed will heat in the fall months, but never heat as late as January 1st? A. No, sir; I don't know it. Q. The kind of seed you raise will heat right on up to the 1st of February? A. Yes; they will heat if you put too many together, and if you gin a pile of cotton for somebody that is damp and the seed is damp. Q. The seed you plant will heat up to the 1st of February? A. They will if you get them wet or put wet seed in with dry seed. Q. Was not the whole trouble between you and the oil mill that they wouldn't sell you meal? A. No, sir. Q. You didn't try to buy meal from them and they told you they couldn't supply you? A. No, sir. I tried to buy meal from them, but they didn't tell me they couldn't supply me. They simply asked me a dollar a ton more for it than I could buy it elsewhere. Q. Wasn't this whole difficulty because you wanted to sell your seed to somebody else to get your meal? A. No, sir. Q. That was not so? A. No, sir. Q. Did you or not tell Mr. D. E. Godbold at your store in Fork, during the month of November, about the middle of November, 1910, that unless the Marion Cotton Oil Mill would pay you more for your seed than anybody else that they were not going to get them because you had to use your seed to get meal with? A. No, sir; and Mr. Godbold can't tell me that I did. Q. You didn't say that? A. No, sir; and he knows I didn't. Q. Any time during that fall? A. No, sir; no time. Q. You didn't tell him that at any time? A. No, sir. Q. The trouble between you and the oil mill was not simply this: That you had neglected to provide for your meal and you wanted to sell your seed to some other mill to obtain meal? A. No, sir. Q. Wasn't that the trouble? A. No, sir; because you could swap seed for meal anywhere. Q. Some other mill offered you meal at a dollar a ton cheaper if you would let them have your seed? A. You could buy it almost anywhere for a dollar less than they offered it to me. Q. That was the reason they offered you the meal for a dollar a ton less? A. No, sir; it was not. Q. To get your seed? A. No, sir. Q. You didn't tell them that? A. No, sir. Q. You didn't tell Mr. Culvern that? A. No, sir. Q. You didn't tell Mr. Godbold that? A. No, sir. Q. Did you and Mr. Culvern have a conversation over the phone about canceling this contract some time in

*dicial:* 94 S. C. 33. *Pleading conditions in contract:* Code Civil Proc. 212. *Variance between pleadings and proof:* 33 S. C. 562. *Substantial compliance with terms of contract:* 78 S. C. 453. *Inadvertent omission to charge request:* 96 S. C. 74. *Charge covered request:* 94 S. C. 224.

November? A. No, sir. I can tell you what our conversation was: I called him up from Dillon to know what I could buy some meal for from him. He was at his house sick, and he priced me the meal at a dollar a ton higher than anybody I had prices from. Q. Was he under any contract to sell you meal? A. No, sir. I waited until I came home to my office at Fork, and I called him up again and asked him about the meal, how about some meal and the price of it, and if he couldn't sell it to me for less than he had priced it to me. He said, "No," that was the best price he could make on it; that he could sell all the meal he had at that price. Q. Was that all the conversation you had? A. No, sir. Q. Go on and tell the rest. A. He told me that he couldn't sell me the meal for any less. I told him I could buy the meal for less. He said, "You oughtn't to expect me to sell it to you as cheap as the other mills, as we are paying you such a big salary." I said, "If that be the case, then it would pay me better"—we had been figuring on the cotton seed—I told him it would pay me better to quit representing the mill than to come and pay more for meal and take less for seed. He said, "That will suit me." He said, "That is what I want you to do." He said, "Come down and let's straighten up." I told him when I decided to do that I would come down, and I didn't come. Q. Didn't you all cancel the contract and you agreed to come down later and settle the balance between you? A. No, sir. That ended the conversation right there. It is very reasonable that it would pay me to cancel the contract if I had to pay more for meal and take less for seed. Q. When did you say you offered him your own seed? A. Some time in the last of January. Q. Did you tell Mr. Culvern who offered you more than he offered you? A. I don't remember whether I told him or not. Q. Did you or not? A. I don't remember whether I told him who offered it or not; just so I was offered that. Q. Were you not employed to represent their interest? A. That was for my own seed. Q. But you say other people were paying more for seed than they were; wasn't it your duty to let them know who it was? A. All the mills were paying more for it. Q. Didn't he ask you who was doing it and you wouldn't tell him? A. They wanted me to submit in writing who it was offered me the price for my seed, and I would not do it. That was my individual seed. If it had been an outside person I would have done it. Q. You stated that you used all your time to help their business, you did what you could to promote their interests; now, wasn't it your duty, if you were working for them and taking their money, if their price was not up to the market, was it not your duty to let them

April 21, 1915.

The opinion of the Court was delivered, after reciting the foregoing statement of facts, by Mr. Justice Fraser.

The first and second exceptions complain of error in the admission of testimony as to the market price." If there was error, it was wholly immaterial, because there was no contention in the evidence that the price

know who was paying more? A. I had done that often, and it didn't amount to nothing. They wouldn't give me any better limits to buy seed. Q. Did you write them that letter (showing letter to witness)? A. Yes, sir. I didn't write it, but I dictated it. Q. You did refuse to let them know? A. Well, I say I did refuse to let them know who made me the price on my own individual seed.

Defendant introduces letter from J. W. & R. S. Moore, to Marion Cotton Oil Company, dated January 28, 1911.

Q. You wouldn't show them, then? A. No, sir; not my own individual seed. Q. What did you mean by "the proper time?" A. When we got together, if it was before that, if they came up and paid me my money, I would show them then. Q. Wasn't it a fact that you had an offer from your brother and you were trying to prize them up? A. No, sir; I had no offer from him whatever. Q. Why wouldn't you tell them who offered you that and give them a chance to meet it? A. Because I didn't think it was my business to tell them who. It was my individual seed. If it had been somebody else's seed I would have told them. It was to my interest to get all out of my seed I could. Q. Did you know there was such a clause as this in this contract, that you should use your time and influence towards promoting the interest of the party of the first part, both in the purchase of seed and the sale of produce of every kind and in every other way? A. Yes, sir. Q. Didn't good faith require you to tell who was paying more for seed than they were, when you were taking their money for doing that; didn't good faith and the promotion of their business require you to give them the name of the person paying more for seed than they were? A. Every mill I called up were paying more for seed than they offered me for my seed. This was my seed, and I didn't think it was necessary to tell them. Q. You refused to tell them a single person that was paying more? A. Yes; I told him there were lots of people that were paying it, and he knows it. Q. You said you would tell him at the proper time? A. He asked me over the phone. Q. Did you tell him? A. No, sir. Q. You told him you would tell him at the proper time? A. I never did tell him who made me that offer on my individual seed. If it had been an outsider I was buying the seed from, I would certainly have told him. Q. What business were you engaged in beside buying cotton seed? A. Merchandising, farming, and in the brick business. Q. Did you send the Oil

offered was up to the market price. The exact market price was not in issue.

Appellant considers 3, 4, 5 and 6 together and says exceptions 4 and 6 raise the question on the motion for a nonsuit that performance of some of the services, as to which no

---

Mill Company this statement (showing paper to witness)? A. Yes; my bookkeeper did. Q. Does that statement correctly set forth the transactions according to your books? A. I think so, as well as I remember now. Q. That is the one you sent them? A. Yes, sir; that is one of them. Q. It shows the credits and debits? A. Yes; that shows the money they paid me and the amount of seed I bought for them.

Defendant offers to introduce statement. (Objected to by plaintiff on the ground of irrelevancy. Objection overruled. Excepton noted.) Defendant introduced statement.

Q. Did you send them reports of seed purchased for the defendant? A. Every day I bought any seed. Q. At the last trial didn't you say you did not? Didn't you tell me you didn't send reports every day? A. No, sir; I don't think I did. I know I didn't. I couldn't admit I sent them every day, because I didn't buy seed every day during the year. Q. I am talking about the days you bought seed, when this case was tried before, didn't you admit you didn't send them every day? A. I sent a report regularly along as I bought seed. I've got a copy of the reports right over there.

Redirect examination:

Q. Did you say cotton seed would heat any time they would get wet? A. If you wet the seed that came out of one bale and put them in a pile of 10,000 bushels, it would heat the whole pile, if you let them stay there long enough. I have tried it.

Q. Do you know whether the seed of the Marion Cotton Oil Company were heating or not? A. I only know what Mr. Culvern said about high-priced seed and they were heating on him. Q. And gave that as a reason he didn't want your seed? A. Yes, sir. Q. As a matter of fact, did you buy your meal and sell your seed to the same person? A. No, sir. Q. You sold your seed to one person and bought your meal from another? A. Yes, sir. Q. How did the price of that meal compare with the price Mr. Culvern gave you? A. I got it at a dollar a ton less. Q. As I understand you, you sold your seed to one person and bought your meal from another person for a dollar a ton less than you could have bought it from Mr. Culvern? A. Yes, sir.

Redirect examination:

Q. When did you buy your meal? A. In the last part of February or middle. Q. Had you already sold your seed? A. Yes, sir. Q. In the sale of those seed, was there any condition that you buy your meal there? A. No, sir. Q. Did it have any relation to that? A. Not a bit in the world.

waiver had been alleged, had not been proved and
exceptions 3 and 5 present the contention that there
was a failure to prove the waiver alleged as well as a
failure to prove other terms of the contract as to which no
waiver had been alleged.   These exceptions cannot be sus-

W. E. Caldwell testified:

Direct examination:

Q. Mr. Caldwell, what is your business?  A. I am with the Southern
Cotton Oil Company at Dillon.  Q. How long have you been in the
cotton oil mill business?  A. Nineteen years.  Q. In the season of 1910
and 1911, were you familiar with the market price that the mills were
paying for seed?  A. I was in the State of North Carolina, where I was
located at that time.  Q. What point in the State of North Carolina?
A. In Gibson, just on the State line.  Q. What was the market price
for seed during the months of January and February, 1911?  What was
the range of prices?

Defendant's counsel objects, on the ground that the witness had
disqualified himself to answer the question as he has stated that he was
familiar with the prices in North Carolina.

Q. Were you familiar with the prices in South Carolina?  A. Being
on the State line, I was.  Q. Familiar with them in both States?  A.
Yes, sir.  We have a mill in Bennettsville, just ten miles from where I
was.  Q. Did you have any connection with the mill at Bennettsville?
A. No, sir; but I paid the same for seed.  Q. What was the range of
prices for seed during the months of January and February, 1911?

Defendant objects to witness testifying as to February.

Q. In the month of January, what was the price?  A. My recollection
is in the early part of January we paid 50 cents for seed at Gibson and
also at Bennettsville, and some time during the month of January we
paid as high as 54 cents for seed in carload lots.  Q. What is the
nearest oil mill to Fork and to Spire's Siding?  A. I don't know the
distance to Marion.  I think Marion is the nearest.  Q. How far is it
from Dillon?  A. It is 11 miles from Smithboro to Dillon.  I don't know
the distance from Smithboro to Fork and Squire's Siding.  I think
Marion is the nearest mill.  Q. Do you know what the Dillon Mill was
paying in January and February, 1911?  A. Only by the record.  Q.
Have you the original records of the Dillon Mill at that time?  A. Yes,
sir.  Q. (By Mr. A. F. Woods.)  Did you keep those books?  A. No,
sir.

Defendant's counsel objects to introduction of books.

Eugene P. Culvern testified:

Direct examination:

Q. Mr. Culvern, during 1910 and 1911, did you occupy any position
with the Marion Cotton Oil Company?  A. Yes, sir; I was the manager

tained.   There were but four questions.   The contract was in evidence.   There was evidence (it may be conflicting) that plaintiffs had performed.   The question as to rescission and the sufficiency of the excuse for nonperformance, on the nonperformance pleaded, were questions for the jury.

for the company.  Q. Are you now employed by the Marion Cotton Oil Company?  A. I am employed by the same people who own this mill, but I am not working for the Marion Cotton Oil Company now.  Q. You are the party who made this contract with Mr. Moore?  A. Yes, sir.  Q. Mr. Culvern, did you have any conversation with Mr. Moore over the phone about the 10th of November, 1910?  If so, state what it was.  A. Yes; I remember Mr. Moore called me up and wanted to buy some meal, asked me my price on the meal, and I named him the price.  He said that was too high, that he could buy it cheaper, but, in order to buy his meal cheaper, he would have to give the other people the refusal of his seed.  I stated to Mr. Moore that we didn't care where he bought his meal, we could sell all our meal, but he was under contract to ship us his seed, and we paid him a salary for it and expected to buy his seed at the market price.  He said he didn't see why we should ask him so much more for meal than anybody else and held him down that way.  He said if he had to be held down that way he would prefer to cancel the contract.  I told him that would be all right with me; that we would consider it cancelled; that that was what I wanted him to do.  Mr. Moore said, "All right."  I said, "When are you coming down and have a settlement?"  He said, "On Friday."  This was on Thursday, and he said he would come down on Friday and have a settlement.  He didn't come, and the following week I called him up and asked him why he didn't come.  He said he had reconsidered; that he had a man helping him and had gone to some expense and he preferrd to go ahead and buy seed and renew the contract.  I told him if he would get busy and buy us some seed and ship us his own seed we would give him the market price and we would let the contract go on.  Q. When was it that he offered you his own seed?  A. It was in the latter part of December, is my recollection.  Q. When did he offer them to you again, if at all?  A. I don't remember his offering them to me any more.  Q. The only time you remember his offering them to you is the latter part of December?  A. Yes, sir.  Q. You didn't keep the books?  A. No, sir.  Q. Do you know what you were paying for seed along about the last of January, in carload lots?  A. In carload lots we were paying about 50 to 52 and 53 cents, in that neighborhood.  Q. You would have paid it to Mr. Moore if he had offered you the seed?  A. Yes; at that time.  Q. When was that?  A. In January.  Q. Did he offer them to you at that time he said he sold them?  A. No, sir.  Q. Is there anything else you care to say about it?  A. Only this: In the oil mill business the market fluctuates very often, and if Mr. Moore had offered me his seed at the

The seventh exception complains of error in refusing the nonsuit on the ground of a variance between the allegations of the complaint and the proof. There has been no attempt to show that the defendant has been misled and this is necessary, under the express terms of the

time he sold, or was ready to sell, I might have been willing to take them at the price he offered them to me at before that, but the trouble was he didn't offer them to me at that time. I very often refuse seed one day, and the very next day I would have been glad to buy them at the same price I turned them down at. Q. He didn't offer you his seed when he said he sold them? A. No, sir. Q. You would have been willing to pay that price if he had? A. We were paying it. Q. Was your mill paying the market price in this territory? A. There is no question of it. We were buying seed all around home and all over the country and couldn't have got them otherwise. Q. You were paying the full market price for this territory? A. Yes, sir. Q. Is it or not a fact that, owing to local conditions, each section has a price of its own? A. Yes, sir. Q. Sometimes you are paying more than another section and sometimes less? A. Yes, sir. Q. The market price is a question of local conditions? A. Yes, sir. Q. Your mill was paying the full market price in the section of Marion, Fork, and Squire's Siding at that time? A. Yes, sir.

Cross-examination:

Q. What was that market price? A. We were paying in the latter part of January, at the time he said he sold his seed, from 50 to 53 cents a bushel. Q. What commission were you allowing on carload lots? A. To our regular buyers, we were allowing about $1.25 a ton. Q. How much would that be a bushel? A. A little over a cent and a half a bushel. Q. So, if you were paying from 50 to 53 cents, did that include the cent and a half a bushel? A. That included the commission that was on carload lots of seed as we would have bought Mr. Moore's. Q. Are you positive the market price the latter part of January was 50 to 53 cents? A. Yes; I think so. Q. Is that your signature (showing letter to witness)? A. Yes, sir. Q. Did you write that letter? A. Yes; I wrote it.

Plaintiff introduces letter from 'Eugene C. Culvern to Messrs. J. W. & R. S. Moore, dated January 21, 1911.

Q. In view of your statement that you were paying from 50 to 53 cents for seed, suppose you read the letter. A. I see what the letter is. The market might have changed in two or three days. Q. Mr. Culvern, you say in this letter: "As our phone conversation yesterday afternoon, beg to advise that we could not use your seed at 53 cents per bushel. They are not nearly worth this much, and we are well posted as to the price which is now ruling. We are perfectly sure that no oil mill would care for seed at anything like this price. We

Code.   See Code of Civil Procedure, section 220, and cases there cited.

The eighth and fourteenth exceptions complain that his Honor confused performance with readiness to perform. If it was error, it was not prejudicial, because the contract

are paying at present in Marion 45 cents per bushel and commission in carloads.  The market price for seed is the prices which the mills are paying for them, and not a price which might be made by some speculator.  I asked you, the last time you were in our office, to let us see the offer which you had for your seed in writing, signed up by the manager or representative of the mill making the offer, so that I could show same to the president of our mill, if necessary, and am sorry that you refused to comply with this request."  A. As I said, the market might have changed in two or three days.  Q. Mr. Culvern, you testified, when Mr. Woods examined you, that that conversation was in December.  You were wrong about that.  It was in January, wasn't it?  A. We had several conversations.  Q. You testified that this offer of seed was in December?  A. I said that was my recollection of it.  Q. Did you use the word "recollection?"  A. Yes, I did.  Q. It was a month later, wasn't it?  A. That one was.  Q. There must have been some talk between you and Mr. Moore about 53 cents?  A. There might have been.  Q. Now, Mr. Culvern, you say that you and Mr. Moore cancelled this contract about November 10th?  A. About November 10th is about the time we had the conversation in which we agreed to cancel it, and he said he would come down and settle our account.  Q. Can you swear from your recollection, or are you positive that you agreed to cancel at that time?  A. It was a phone conversation.  It was certainly a clear understanding on my part that Mr. Moore agreed to come down on the following Friday and cancel the contract.  Q. Did you cancel the contract?  A. I supposed that was the cancellation of it at that time.  Q. Didn't you continue to act on this contract?  A. You remember I told you we had another conversation the next week, in which he said he wanted to let the contract stand.  Q. You continued to treat him as your agen?  A. Yes; after the second conversation.  Q. You say this conversation was about November 5th?  A. Yes, sir; near about that time.  Q. Did you write that letter on November 10th?  A. Yes.  Q. On November 25th you were still sending them money to purchase seed for your account?  A. Yes, sir.  Q. Treating them as your agent?  A. Yes, sir.  Q. Doing the same thing on November 10th, weren't you, treating them as your agent?  A. Yes, sir.  Q. Still doing it in December?  A. Yes; right on through the season.  Q. Didn't they put up a seed house for you in December?  A. I believe they did.  Q. Now, as I understand it, you swore in your examination in chief that they only offered you these seeds one time, and if he had offered them to you another time you might have taken them?  A. We might have taken

provided that the plaintiffs agreed to purchase cotton seed with money furnished by the defendant (which plaintiffs agree to hold in trust) and to purchase at the prices named by the defendant. Plaintiffs were to buy seed with defendant's money and at defendant's prices. There is no showing that the conditions for service had arisen. Under the contract plaintiffs agreed to buy seed for defendant and for no one else. Plaintiff said he had

them one day at a price we would not have cared to buy them at the day before. The market changes. Q. Didn't you testify in your examination in chief that Moore had only offered these seeds to you one time, but if he had offered them to you again you might have taken it? A. Yes; might have done so. Q. You are mistaken about that? A. I was a little mistaken in the date of the conversation. Q. You had a talk in December? A. I think so. Q. You certainly had it in January? A. Yes. Q. What were you paying for seed on the day you had a conversation with him in January? A. Our books show we were paying in carloads an average of about 50 cents a bushel. Q. But you wrote him 45 cents? A. At different times. Q. Forty-five cents plus commissions of a cent and a half would be 46½ cents. You were paying 50 cents, but you wrote Moore 45? A. Prices changed several times during the month.

Redirect examination:

Q. The prices you were paying on one day is no indication what the prices would be the week later? A. No, sir; not a bit. Q. You were detailing your conversation just from your recollection? A. Yes, sir; phone conversation. Q. Something that hoppened nearly four years ago? A. Yes, sir. Q. You were just stating the best of your recollection? A. Yes, sir.

Recross-examination:

Q. Would the price range eight cents a bushel in a short time? A. It might do it. Q. Did it at that time? A. I don't remember.

Excerpts from the Charge:

The Court: I am construing this contract as I see it. Of course, it is understood that the plaintiff in his complaint claims that he is entitled to the entire amount, and the defendant claims they are not entitled to pay them anything. That is the contention of the paries; but I am construing this contract. A man would not have to work the entire six months in order to get pay for a part, because you are all commonsense men, and anybody can see from this contract it means what it says. It is to be paid monthly, so many dollars a month, and payable at the end of each month. You will observe, gentlemen, that this is

done more than he agreed to do by buying seed with his own money. If that was not true, defendant ought to have shown it. That is not confession and avoidance. The charge as to readiness to perform was harmless.

These exceptions cannot be sustained.

The ninth exception complains of a charge on the facts. This exception cannot be sustained. The statement of facts was by plaintiff's attorney and the record fails to show that his Honor adopted that part that stated the facts.

The tenth exception complains of error in the charge, that where the plaintiff alleges a contract and the defendant alleges a rescission, the burden is upon the defendant to show rescission, and if he fails, the verdict must be for the plaintiff. On that issue the statement is correct. His Honor had already charged that the plaintiff must prove his contract, by the preponderance of the evidence.

This exception is overruled.

The appellant groups the 11th, 12th and 13th exceptions and states the question as follows: The basis of these exceptions is that the Judge charged the jury that it would only be necessary, in order for the plaintiff to recover, for them to show a substantial performance of their contract. This charge was correct under *McMillan* v. *Insurance Co.,* 78 S. C. 433, 58 S. E. 1020, 1135.

The sixth and seventh requests were covered by the general charge.

---

simply a contract of employment. The parties of the second part do not guarantee that they will buy any seed at all, but they are put there to buy seed; that is their business; and under this contract, if they go ahead and do their best to buy seed, whether they buy any or not, the party of the first part would be liable. * * * If a man hires the foreman to sell goods and pays him a fixed salary of $100 or $200 a month, he would be liable whether you sold a dollar's worth of goods or not, if you sold the best you could. You cannot make people buy.

The Judge is not bound to use the figure of balances and when he charges that the plaintiff is bound to prove his case by the preponderance of the evidence, he has declared the law.

The fifteenth exception cannot be sustained.

The sixteenth exception cannot be sustained. The appellant contends that when two parties make a contract and rescind it, and make a new contract, then the party who would avail himself of any benefit from the contract, he must rely on the new contract. That is true, provided there is a new contract. If, however, after a rescission, the parties agree to continue operations under the original contract, then the original contract is the only contract and is the only basis of the suit.

The judgment is affirmed.